UNITED STATES of America, Appellee,

v.

Andrew DUGGAN, Eamon Meehan, Gabriel Megahey, and Colm Meehan, Defendants-Appellants.

Nos. 922 to 925, Dockets 83–1313, 83–1315, 83–1317 and 83–1318.

United States Court of Appeals, Second Circuit.

Argued April 30, 1984.

Decided Aug. 8, 1984.

---

Carol B. Amon, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty. for the Eastern District of New York, Allyne R. Ross, Mary McGowan Davis, Jane Simkin Smith, David V. Kirby, Michael H.

Gold, Asst. U.S. Attys., Brooklyn, N.Y., on the brief), for appellee.

William A. Kelly, New York City, and Edward S. Panzer, New York City, for defendant-appellant Andrew Duggan.

Barry C. Scheck, New York City (Lawrence A. Vogelman, Cardozo Criminal Law Clinic, New York City, Michael G. Dowd, Manton, Pennisi & Dowd, Kew Gardens, N.Y., and Ellen C. Mishkin, Law Student, on the brief), for defendant-appellant Eamon Meehan.

Bruce Goldstone, New York City (Lipsig, Sullivan & Liapakis, P.C., New York City, on the brief), for defendant-appellant Gabriel Megahey.

Peter Lushing, New York City (David L. Lewis, Lewis & Fiore, New York City, on the brief), for defendant-appellant Colm Meehan.

Before FEINBERG, Chief Judge, and MANSFIELD and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

The principal issues raised in this appeal by alleged agents of the Provisional Irish Republican Army ("PIRA") concern the constitutionality and proper application of the Foreign Intelligence Surveillance Act ("FISA" or the "Act"), 50 U.S.C. §§ 1801–1811 (Supp. V 1981). Defendants Andrew Duggan, Eamon Meehan, Gabriel Megahey, and Colm Meehan appeal from judgments of conviction entered in the United States District Court for the Eastern District of

New York, after a jury trial before Charles P. Sifton, *Judge*. Duggan, Megahey, and Eamon Meehan were convicted of (a) unlicensed exportation of items on the United States Munitions List, in violation of 22 U.S.C. § 2778(b)(2) (1982) [1] (count 2); (b) transportation of explosives in interstate commerce without a license, in violation of 18 U.S.C. § 842(a)(3)(A) (1982) (count 3); (c) transportation of explosives in interstate commerce knowing that the explosives would be used to kill, injure, or intimidate individuals, in violation of 18 U.S.C. § 844(d) (1982) (count 4); (d) transportation in interstate commerce of firearms with their serial numbers removed, in violation of 18 U.S.C. § 922(k) (1982) (count 5); (e) delivery to a common carrier of a shipment containing firearms without giving notice to the carrier of the contents of the shipment, in violation of 18 U.S.C. § 922(e) (1982) (count 6); (f) conspiracy to violate both 26 U.S.C. § 5861(d) (1982), which proscribes possession of unregistered destructive devices, and the statutes listed in counts 3 through 6, in violation of 18 U.S.C. § 371 (1982) (count 1). Colm Meehan was acquitted on the two counts involving interstate transportation of explosives (counts 3 and 4) and was convicted on all other counts. The Meehans were also convicted of possessing guns while illegal aliens, in violation of 18 U.S.C. app. § 1202(a)(5) (1982) (count 7).[2]

On appeal, all of the defendants contend principally (1) that the district court erred in refusing to suppress evidence obtained through a wiretap pursuant to FISA on the grounds that (a) FISA is unconstitutionally

---

1. We cite to the 1982 edition of titles 18, 22, and 26 of the United States Code, which in all material respects is identical to the edition of the Code in effect at the time defendants committed the offenses charged.

2. The court merged the convictions on counts 3 and 4, and sentenced defendants to the following prison terms:

| | Counts | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Duggan | 3 yrs | 2 yrs | – | 3 yrs | 3 yrs | 3 yrs | N/A |
| Megahey | 5 yrs | 2 yrs | – | 7 yrs | 5 yrs | 5 yrs | N/A |
| Eamon Meehan | 3 yrs | 2 yrs | – | 3 yrs | 3 yrs | 3 yrs | 2 yrs |
| Colm Meehan | 2 yrs | 2 yrs | N/A | N/A | 2 yrs | 2 yrs | 2 yrs |

The prison terms for each defendant were to be served concurrently.

broad and violates the probable cause requirement of the Fourth Amendment, and (b) the government failed to comply with FISA's prerequisites for wire surveillance; (2) that the district court erred in excluding their defense that their actions were taken in reasonable good faith reliance on the apparent authority of one Michael Hanratty, a government informant, to act as an agent of the Central Intelligence Agency ("CIA"); and (3) that the conduct of government agents was so outrageous as to deprive them of due process of law. In addition, Eamon and Colm Meehan contend that the district court erred in rejecting their proffered defense of insanity. We reject the defendants' contentions and affirm the convictions.

## I. BACKGROUND

Although none of the defendants challenges the sufficiency of the proof to convict him, we summarize here so much of the trial evidence, taken in the light most favorable to the government, as is necessary to place defendants' major contentions in context. In general the evidence, presented largely through the testimony of Hanratty, videotapes of meetings between PIRA members and undercover law enforcement agents, and tape recordings of telephone conversations involving Megahey, showed defendants as part of a network of men working clandestinely on behalf of PIRA to acquire explosives, weapons, ammunition, and remote-controlled detonation devices in the United States to be exported to Northern Ireland for use in terrorist activities. Megahey, an Irish national who sought political asylum in the United States, was the leader and financier of PIRA operations in the United States. Duggan, an American citizen, was Megahey's assistant in contacting sellers of electronic equipment to be used in remote-controlled bombs and other sophisticated weaponry. Eamon Meehan, under the direction of Megahey, gathered and stored firearms and explosives; Eamon and his brother Colm—both aliens living illegally in the United States—secreted these materials in a shipment of goods bound for Northern Ireland.

### A. The Events

#### 1. PIRA Meets Hanratty

The events that culminated in the June 1982 arrests of the defendants began a year earlier, when Duggan, on the recommendation of an acquaintance, sought out Michael Hanratty, a seller of surveillance and countersurveillance equipment and other electronic items. At this first meeting, Duggan and an associate, Brendon Docherty, a/k/a Brendon Sloan ("Sloan"), identified themselves to Hanratty as members of PIRA, and explained that they sought to purchase equipment for use against the British in Northern Ireland. At a meeting that evening, Duggan, Sloan, and a third companion explained to Hanratty their political views and PIRA's equipment needs. Although Duggan and his associates inquired about the availability of a variety of equipment—including bullet proof vests, electronic tracking systems, and devices to detect the presence of electronic surveillance—their principal interest was in acquiring sophisticated remote-controlled explosive detonators, items that Hanratty could not supply.

Hanratty promptly informed the Federal Bureau of Investigation ("FBI") of these conversations and agreed to provide FBI agents with information gained from any future meetings, in particular the types of electronic equipment Duggan and his associates desired to purchase. Although the agents did not instruct Hanratty to initiate any further contact with Duggan's group, they requested that he attempt to introduce an undercover FBI agent into future dealings if the opportunity arose.

Over the next six months, Hanratty was contacted by Duggan and Sloan several times for the purchase of a variety of equipment that could be used as fusing mechanisms for bombs. In addition, Sloan asked Hanratty if he could supply surface-to-air missiles ("SAMs"), with which PIRA could shoot down British helicopters.

During these meetings Duggan and his associates frequently spoke of consulting their "money man" for the PIRA purchases. In January 1982, Hanratty was summoned by Duggan for his first meeting with the "money man" and was presented to Megahey. Megahey introduced himself as the leader of PIRA operations in the United States, and stated that all PIRA activities in the United States were conducted with his knowledge. Megahey said he had chosen to reveal himself to Hanratty because Hanratty had become a valuable asset to their organization, and he, *inter alia*, reminded Hanratty of the importance of acquiring certain previously ordered devices that were needed as safety mechanisms in the construction of remote-controlled bombs.

## 2. *PIRA Meets the FBI*

After Hanratty was introduced to Megahey, the government obtained from a judge of the United States Foreign Intelligence Surveillance Court ("FISA Court" and, generally, "FISA Judge") an order authorizing the FBI to conduct electronic surveillance of Megahey's home telephone. The surveillance was initiated on February 10, 1982, continued pursuant to a renewal order obtained on May 6, 1982, and terminated on June 21, 1982, the date of Megahey's arrest by the FBI. The wiretap intercepted several conversations between Megahey and Duggan concerning PIRA activities, and information from the wiretap led the FBI to conduct surveillance of the home of Eamon Meehan.

In March 1982, Hanratty obtained the bomb safety devices requested by Megahey and his associates and delivered them to Duggan under surveillance by the FBI. The switches had been microscopically marked by FBI laboratory personnel for future identification. Two months later these switches, along with weapons and explosive devices, were found hidden in a shipment of goods loaded by Eamon and Colm Meehan into a shipping container bound for Northern Ireland. Agents who had observed the Meehans' activities secured the container, and caused it to be searched by United States Customs Service officials just before it was to be shipped to Northern Ireland.

In the meantime, two of Duggan's associates had reopened with Hanratty the question of obtaining SAMs. Hanratty told them he could not personally supply the missiles but said he knew of a possible source, a man he identified as "Luis." Hanratty described Luis as a Miami-based wheeler-dealer who supplied arms to Central American and other countries. Hanratty later gave the same story to Duggan in response to a question that Hanratty thought referred to Duggan's associates' inquiries about obtaining SAMs. Thereafter, Duggan and Megahey repeatedly asked Hanratty if he had been contacted by Luis.

On May 2, 1982, at the direction of the FBI, Hanratty introduced Duggan to "Enrique," supposedly one of Luis's lieutenants, played by FBI Special Agent Enrique Ghimenti. The FBI videotaped Duggan's discussion with Ghimenti, in which Duggan described himself as a "buffer" who located available weapons for others to purchase. Duggan told Ghimenti that although he was interested in purchasing hand grenades and automatic weapons, his top-priority was the purchase of SAMs. The session concluded with an agreement to arrange another meeting, to be attended by PIRA representatives more experienced in weapons and prices. Duggan later reported to Hanratty that the meeting had gone well, that he believed Enrique and Luis had access to the missiles PIRA sought, and that although Hanratty was not to be involved in the upcoming transactions, he would remain the contact for both sides.

The meeting with PIRA's technical specialists took place in New Orleans and was also videotaped. Duggan introduced his associates and then absented himself from the discussions. Duggan's associates told Enrique and two undercover FBI agents, playing the roles of Luis and his technical advisor, that they were the "provisionals ... the Irish Republican Army," and stated

that "[w]hat we want is a weapon which will take down ... [British] helicopters, ... [w]arships of the sky." Ultimately, an agreement was reached for PIRA to buy five "Redeye" missiles for $50,000.

The transaction was never consummated, however, as Megahey repeatedly sought to assure himself that PIRA was not dealing with law enforcement agents. (Megahey commented to Enrique that "the only thing we can lose in this is if you're a policeman.") Megahey proposed to have the buyers and sellers exchange hostages until the deal was done and the weapons were in place, reasoning that law enforcement agents would not risk either the loss of their hostage's life or the loss of the missiles. The FBI rejected the hostage proposal, and the proposed purchase of the SAMs was cancelled.

Shortly after these negotiations fell through, the four defendants herein were arrested. They and several of their associates were indicted in a seven-count indictment charging the firearms, explosives, munitions, and conspiracy offenses described at the outset of this opinion.

### B. *The Proceedings Below*

The defendants raised several defenses below at various stages of the proceedings, which the court rejected either for lack of merit or for untimeliness.

#### 1. *The Pretrial Motion to Suppress the FISA Materials*

On July 27, 1982, pursuant to the provisions of FISA, 50 U.S.C. § 1806(b), the Acting Attorney General of the United States, Edward C. Schmults, authorized the use at trial of tape recordings and information obtained pursuant to the FISA surveillance of the activities of the defendants. Shortly thereafter, pursuant to 50 U.S.C. § 1806(c), the government notified the court and the defendants of its intention to introduce evidence from the FISA surveillance at trial. In the following months, the government provided the defendants with copies of all tape recordings, transcripts, surveillance logs, and pen register tapes of all telephone conversations resulting from the surveillance.

Defendants moved to suppress the fruits of the FISA surveillance on a variety of grounds. They contended that FISA surveillance violates a target's First, Fourth, and Fifth Amendment rights because it is too broad; violates the doctrine of separation of powers because it requires the courts to decide political questions; and denies due process and equal protection to aliens. In addition, defendants contended that the requirements set forth in FISA had not been met because an insufficient basis had been provided for the issuance of the surveillance order and because the government had failed to comply with FISA's "minimization" requirements. They also contended that FISA had been improperly used simply to obtain evidence of criminal activity rather than to protect the national security. Defendants asked the court to hold an evidentiary hearing to determine these issues.

The government in turn moved to have the trial court determine the propriety of the electronic surveillance on an *ex parte, in camera* basis pursuant to 50 U.S.C. § 1806(f). In support of this application, the government filed an Affidavit and Claim of Privilege of Acting Attorney General Schmults. The affidavit stated that the FISA applications contained sensitive information concerning United States intelligence sources and methods and other information relating to the efforts of the United States to combat international terrorism. It certified that public disclosure or an adversary hearing with respect to this information would harm the national security of the United States. An additional affidavit of the Acting Attorney General, submitted to the district court *in camera*, set forth in greater detail the facts upon which the claim of privilege was based.

After reviewing all of these materials, Judge Sifton rejected all of defendants' FISA arguments on their merits in a thorough opinion *sub nom United States v. Megahey*, 553 F.Supp. 1180 (E.D.N.Y.1982)

("*Megahey*"), familiarity with which is assumed.

### 2. *The Posttrial FISA Motion*

Following their convictions, defendants asserted new challenges to FISA, to wit, (1) that the surveillance was unlawful because Duggan had not been named as a target, and (2) that the trial evidence revealed that the court had been misled as to the basis for the issuance of the FISA order. The court rejected the first contention on the grounds that it was untimely raised and that there was no requirement that the government name more than one target of the surveillance. The court rejected defendants' second contention after reviewing the public and *in camera* documents and determining that it had not in fact been misled.

### 3. *The Meehans' Proposed Defense of Insanity*

Prior to trial the Meehans sought several times to interpose a defense of insanity, in the nature of "Post-traumatic Stress Disorder" ("PTSD"), as a result of their internment and mistreatment in a Northern Ireland prison in the early 1970's. The first of these motions was made on December 30, 1982, three months after pretrial motions were due and two months after the date the parties were first prepared to go to trial. The details of the motions are set out in Part III below and are here summarized only briefly. The court ordered the attorneys to show cause, pursuant to Fed. R.Crim.P. 12.2(a), why late filing of the defense should be permitted. Because the Meehans' attorneys responded only with conclusory affidavits that did not explain why the defense was not developed earlier, did not give a firm diagnosis, and did not explain how PTSD might legally exculpate the Meehans, the court found that cause had not been shown for the untimely interposition of the defense. Although later applications by the Meehans included affi-

davits with a definite diagnosis, the court viewed these applications as designed primarily to obtain an adjournment of the trial date, which the court felt was unjustified.[3] Judge Sifton also denied a posttrial motion by the Meehans, based on their pretrial supporting papers and their trial testimony describing their prison experiences, for a new trial at which they would be permitted to present the insanity defense.

### 4. *The Proposed Defense of Apparent Authority*

At trial, Duggan and Megahey testified that they had been the unwilling victims of machinations by Hanratty who had convinced them that he was an agent of the CIA and had the authority to send munitions to Northern Ireland. Although Duggan admitted that it was he who initially sought out Hanratty and not vice versa, he claimed that he had merely asked Hanratty to "debug" the offices of the Irish People Paper and that Hanratty had conditioned his assistance on the agreement of Duggan and Sloan to find a contact in Northern Ireland to whom Hanratty could sell his equipment. While Duggan expressed disinterest, Sloan purportedly was persuaded by Hanratty's assurances that he was with the CIA and that the CIA was interested in getting such equipment to Northern Ireland. Sloan persuaded Duggan, despite his initial reluctance, to act as a middleman between Hanratty and Megahey (who was allegedly acting as Sloan's representative), after being assured that Sloan had seen Hanratty's CIA identification and had "checked Hanratty out." Duggan also testified that Hanratty later showed him a white laminated card, without a picture, that bore the words "Central Intelligence Agency," and that, as his relationship with Hanratty grew, Hanratty played on Duggan's sympathies for the IRA effort in Northern Ireland, convincing him that his

---

**3.** The Meehans sought mandamus from this Court to require Judge Sifton to grant them a hearing with respect to the proposed insanity defense. By order dated February 23, 1983, we denied the requested relief "on the explicit assumption that Judge Sifton has ruled that cause for late filing o[r] other relief has not been shown under Rule 12.2(a)."

theretofore peaceful protests were ineffective.

Megahey gave a similar account of his introduction to Hanratty and claimed to have been convinced upon first meeting Hanratty of both Hanratty's CIA connections and his assurance of government approval. He also testified that he had been influenced by the CIA pass, by Sloan's assurances, and by statements of Hanratty that he worked with such persons as George Korkala, Edwin Wilson, and Frank Terpil. Megahey admitted that he was aware that the three named men were the subject of criminal charges in the United States for the illegal exportation of arms to other countries.

Duggan and Megahey sought to explain their videotaped statements describing their prior experience in weapons transactions and expressing their fears of being apprehended by law enforcement authorities by testifying that these words had been placed in their mouths by Hanratty. Both testified that they were told by Hanratty that while other federal agencies might not be aware of the CIA involvement in PIRA activities, and therefore Duggan and Megahey risked the possibility of arrest, any such arrests would be "taken care of" by the CIA.

Eamon Meehan testified that when Megahey asked him to help ship guns to Northern Ireland, Megahey told him that they were dealing with a CIA agent. Colm Meehan testified that he had agreed to help Eemon only after Eamon told him of this conversation with Megahey.

Defendants requested that the trial court instruct the jury that if the defendants had acted in reliance upon the apparent authority of Hanratty as a CIA agent, they should be acquitted. The court declined to give this instruction.

## C. *Issues on Appeal*

On appeal, the defendants principally (1) renew most of their challenges to the constitutionality and application of FISA, (2) contend that the trial court erred by, *inter alia*, refusing to give the requested instruction on apparent authority, and (3) contend that the government's conduct was outrageous and denied them due process of law. The Meehans contend also that the district court erred in refusing to allow them to present their insanity defense. We are unpersuaded.

## II. FISA

Enacted in 1978, FISA generally allows a federal officer, if authorized by the President of the United States acting through the Attorney General (or the Acting Attorney General or the Deputy Attorney General) of the United States, to obtain from a judge of the specially created FISA Court, *see* 50 U.S.C. § 1803, an order "approving electronic surveillance of a foreign power or an agent of a foreign power for the purpose of obtaining foreign intelligence information." *Id.* § 1802(b).

FISA contains several definitions of "foreign power" and "agent of a foreign power." Most pertinently to this case, FISA defines "foreign power" to include "a group engaged in international terrorism or activities in preparation therefor." *Id.* § 1801(a)(4). An "agent of a foreign power" is defined to include both "any person other than a United States person, who ... acts in the United States as ... a member of a foreign power as defined in [§ 1801(a)(4) ]," *id.* § 1801(b)(1)(A), and "any person who ... knowingly engages in ... international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power," *id.* § 1801(b)(2)(C). Section 1801(i) defines "United States person" to include

a citizen of the United States, an alien lawfully admitted for permanent residence (as defined in section 1101(a)(20) of title 8), [and] an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence.

The Act defines "foreign intelligence information," in part, as

(1) information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against—

. . . . .

(B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

. . . . .

(2) information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to—

(A) the national defense or security of the United States; or

(B) the conduct of the foreign affairs of the United States.

*Id.* § 1801(e). "International terrorism" is defined to include activities that—(1) involve violent acts or acts dangerous to human life that ... would be a criminal violation if committed within the jurisdiction of the United States or any State;

(2) appear to be intended—

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by assassination or kidnapping; and

(3) occur totally outside the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum.

*Id.* § 1801(c).

A federal officer making application for a FISA order approving electronic surveillance must include in his application, *inter alia*, "the identity, if known, or a description of the target of the electronic surveillance," *id.* § 1804(a)(3); "a statement of the facts and circumstances relied upon by the applicant to justify his belief that ... the target of the electronic surveillance is a

foreign power or an agent of a foreign power," *id.* § 1804(a)(4); and a certification by the Assistant to the President for National Security Affairs, or an executive branch designee of the President that, *inter alia*, the certifying official deems the information sought to be foreign intelligence information and that the purpose of the surveillance is to obtain foreign intelligence information, together with a statement of the basis for the certification that the information sought is the type of foreign intelligence information designated, *id.* § 1804(a)(7). When the target is a United States person, the government is required to minimize the acquisition and retention of nonpublicly available information and to prohibit its dissemination, consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information, *id.* § 1801(h); and the application must set out what minimization procedures are proposed, *id.* § 1804(a)(5).

The FISA Judge is authorized to enter an order approving electronic surveillance if he finds, *inter alia*, that

on the basis of the facts submitted by the applicant there is probable cause to believe that—

(A) the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided,* That no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States,

*id.* § 1805(a)(3), and finds that the applying official has obtained the requisite authorization and has submitted the required information, *id.* §§ 1805(a)(1), (2) and (5). If the target is a United States person, the FISA Judge is not to approve surveillance unless he finds that the certifications submitted pursuant to § 1804(a)(7)(E) are not clearly erroneous on the basis of the data before him. *Id.* § 1805(a)(5).

Defendants mount two types of challenge with regard to FISA. First, they

contend that the Act is unconstitutional on several grounds. In addition, they contend that even if FISA is not unconstitutional, its requirements were not met in this case.

### A. *The Constitutionality of FISA*

Defendants contend that FISA is unconstitutional principally on the grounds that (1) it is so broad as to deprive certain persons of due process of law, (2) it violates the probable cause requirement of the Fourth Amendment, and (3) it deprives nonresident aliens of the equal protection of the law. We find no merit in these contentions.[4]

#### 1. *The Scope of the Act*

Defendants argue that FISA is impermissibly broad in several respects. They point out that foreign intelligence information includes "information with respect to a foreign power ... that relates to ... (A) the national defense or the security of the United States; or (B) the conduct of the foreign affairs of the United States." 50 U.S.C. § 1801(e)(2). They also point to the definition of an agent of a foreign power as a person, other than a United States person, who

> acts for or on behalf of a foreign power which engages in clandestine intelligence activities in the United States contrary to the interests of the United States, when the circumstances of such person's presence in the United States indicate that such person *may* engage in such activities in the United States,

*id.* § 1801(b)(1)(B) (emphasis added), and to the definition of an agent of a foreign power as any person who

> knowingly engages in clandestine intelligence gathering activities for or on behalf of a foreign power, which activities involve or *may* involve a violation of the criminal statutes of the United States,

*id.* § 1801(b)(2)(A) (emphasis added). Defendants argue that the breadth of the above definitions gives the Act unlimited

scope and permits the electronic surveillance of persons who "may" be engaging in activities that "may" violate United States law.

■ Interesting though these arguments may be in the abstract, they have no application to the case at hand. The information relayed by Hanratty to the FBI clearly portrayed Megahey as a member of a "group engaged in international terrorism or activities in preparation therefor," *id.* § 1801(a)(4); Megahey was therefore an agent of a foreign power under § 1801(b)(1)(A). There is no suggestion in the record that Megahey was targeted because he was or may have been gathering intelligence. The sections of the Act relied upon by the defendants to show that the Act is impermissibly broad are simply irrelevant to this case. The sections and definitions plainly applicable to Megahey are explicit, unequivocal, and clearly defined.

■ Nor are we impressed by defendants' argument that insofar as § 1801(e)(2) defines foreign intelligence information as information that "relates to ... (A) the national defense or the security of the United States; or (B) the conduct of the foreign affairs of the United States" it is impermissibly vague. Section 1801(e)(1)(B) defines foreign intelligence information as "information that relates to ... the ability of the United States to protect against ... international terrorism by a foreign power or an agent of a foreign power." Given the information provided by Hanratty, the government plainly had a basis under this section for describing the information sought by surveillance of Megahey, self-proclaimed leader of an international terrorist group, as foreign intelligence information. Thus, even if we thought § 1801(e)(2)'s concepts of national defense, national security, or conduct of foreign affairs to be vague, which we do not, we would find therein no basis for reversing the convictions of these defendants, whose

---

**4.** Defendants mention numerous other theories on which they contend that FISA violates their constitutional rights. We have considered and rejected all of these arguments. They do not warrant discussion.

circumstances were governed by an entirely different definition.

### 2. The Probable Cause Requirement of the Fourth Amendment

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause ...." Defendants argue principally (1) that the Amendment applies to all proposed surveillances, including those in national security cases, and (2) that even if there were an exception for national security matters, it would not apply to terrorism cases where the objects of the terrorism are entirely outside of the United States. We reject these contentions.

Prior to the enactment of FISA, virtually every court that had addressed the issue had concluded that the President had the inherent power to conduct warrantless electronic surveillance to collect foreign intelligence information, and that such surveillances constituted an exception to the warrant requirement of the Fourth Amendment. *See United States v. Truong Dinh Hung,* 629 F.2d 908, 912–14 (4th Cir.1980), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982); *United States v. Buck,* 548 F.2d 871, 875 (9th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 263, 54 L.Ed.2d 175 (1977); *United States v. Butenko,* 494 F.2d 593, 605 (3d Cir.) (*en banc*), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown,* 484 F.2d 418, 426 (5th Cir.1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974). *But see Zweibon v. Mitchell,* 516 F.2d 594, 633–51 (D.C.Cir. 1975) (dictum), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976). The Supreme Court specifically declined to address this issue in *United States v. United States District Court [Keith, J.],* 407 U.S. 297, 308, 321–22, 92 S.Ct. 2125, 2132, 2138–39, 32 L.Ed.2d 752 (1972) (hereinafter referred to as *"Keith"*), but it had made clear that the requirements of the Fourth Amendment may change when differing governmental interests are at stake, *see Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and it observed in *Keith* that the governmental interests presented in national security investigations differ substantially from those presented in traditional criminal investigations. 407 U.S. at 321–24, 92 S.Ct. at 2138–40.

In *Keith,* the government argued that Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510 *et seq.* ("Title III"), recognized the constitutional authority of the President to conduct domestic security surveillances without a warrant. The Court rejected this argument, noting that the legislative history made clear that Title III was not intended to legislate with respect to national security surveillances. The Court went on to hold that a warrant was required in *Keith* under the Fourth Amendment; but the implication of its discussion was that the warrant requirement is flexible and that different standards may be compatible with the Fourth Amendment in light of the different purposes and practical considerations of domestic national security surveillances. 407 U.S. at 321–24, 92 S.Ct. at 2138–40. Thus, the Court observed

> that domestic security surveillance may involve different policy and practical considerations from the surveillance of "ordinary crime." The gathering of security intelligence is often long range and involves the interrelation of various sources and types of information. The exact targets of such surveillance may be more difficult to identify than in surveillance operations against many types of crime specified in Title III. Often, too, the emphasis of domestic intelligence gathering is on the prevention of unlawful activity or the enhancement of the Government's preparedness for some possible future crisis or emergency. Thus, the focus of domestic surveillance may be less precise than that directed against more conventional types of crime.
>
> ... Different standards [for surveillance involving domestic security] may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Govern-

ment for intelligence information and the protected rights of our citizens. For the warrant application may vary according to the governmental interest to be enforced and the nature of citizen rights deserving protection.

*Id.* at 322–23, 92 S.Ct. at 2139–40.

Against this background, Congress passed FISA to settle what it believed to be the unresolved question of the applicability of the Fourth Amendment warrant requirement to electronic surveillance for foreign intelligence purposes, and to "remove any doubt as to the lawfulness of such surveillance." H.R.Rep. 1283, pt. I, 95th Cong., 2d Sess. 25 (1978) ("House Report"). FISA reflects both Congress's "legislative judgment" that the court orders and other procedural safeguards laid out in the Act "are necessary to insure that electronic surveillance by the U.S. Government within this country conforms to the fundamental principles of the fourth amendment," S.Rep. No. 701, 95th Cong., 2d Sess. 13, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3973, 3982 ("Senate Report 95–701"), and its attempt to fashion a "secure framework by which the Executive Branch may conduct legitimate electronic surveillance for foreign intelligence purposes within the context of this Nation's commitment to privacy and individual rights." S.Rep. No. 604, 95th Cong., 1st Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3904, 3916 ("Senate Report 95–604"). In constructing this framework, Congress gave close scrutiny to departures from those Fourth Amendment doctrines applicable in the criminal-investigation context in order

> to ensure that the procedures established in [FISA] are reasonable in relation to legitimate foreign counterintelligence requirements and the protected rights of individuals. Their reasonableness depends, in part, upon an assessment of the difficulties of investigating activities planned, directed, and supported from abroad by foreign intelligence services

and foreign-based terrorist groups. The differences between ordinary criminal investigations to gather evidence of specific crimes and foreign counterintelligence investigations to uncover and monitor clandestine activities have been taken into account. Other factors include the international responsibilities of the United States, the duties of the Federal Government to the States in matters involving foreign terrorism, and the need to maintain the secrecy of lawful counterintelligence sources and methods.

Senate Report 95–701, at 14–15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3973, 3983.

We regard the procedures fashioned in FISA as a constitutionally adequate balancing of the individual's Fourth Amendment rights against the nation's need to obtain foreign intelligence information. The governmental concerns are detailed in the passages quoted above from *Keith* and the legislative history of FISA, and those concerns make reasonable the adoption of prerequisites to surveillance that are less stringent than those precedent to the issuance of a warrant for a criminal investigation. *See generally United States v. Belfield,* 692 F.2d 141, 148 (D.C.Cir.1982) (examining *in camera* review procedures of FISA (see Part II. B. 2., *infra*)). Against this background, the Act requires that the FISA Judge find probable cause to believe that the target is a foreign power or an agent of a foreign power, and that the place at which the electronic surveillance is to be directed is being used or is about to be used by a foreign power or an agent of a foreign power; and it requires him to find that the application meets the requirements of the Act. These requirements make it reasonable to dispense with a requirement that the FISA Judge find probable cause to believe that surveillance will in fact lead to the gathering of foreign intelligence information.[5] Further, if the target is a United States person, the Act

---

**5.** A fortiori we reject defendants' argument that a FISA order may not be issued consistent with the requirements of the Fourth Amendment un-

less there is a showing of probable cause to believe the target *has committed a crime.*

requires the FISA Judge to determine that the executive branch's certifications pursuant to § 1804(a)(7) are not clearly erroneous in light of the application as a whole, and to find that the application properly proposes, as required by § 1801(h), to minimize the intrusion upon the target's privacy.

We conclude that these requirements provide an appropriate balance between the individual's interest in privacy and the government's need to obtain foreign intelligence information, and that FISA does not violate the probable cause requirement of the Fourth Amendment.

■ Nor is there any merit to defendants' contention that the national security interests of the United States are not implicated by acts of terrorism directed wholly outside the United States. The government points out that if other nations were to harbor terrorists and give them safe haven for staging terrorist activities against the United States, United States national security would be threatened. As a reciprocal matter, the United States cannot afford to give safe haven to terrorists who seek to carry out raids against other nations. Thus, international terrorism conducted from the United States, no matter where it is directed, may well have a substantial effect on United States national security and foreign policy. In recognition of these considerations, Senate Report 95–701 noted:

> The committee intends that terrorists and saboteurs acting for foreign powers should be subject to surveillance under this bill when they are in the United States, even if the target of their violent acts is within a foreign country and therefore outside actual Federal or State jurisdiction. This departure from a strict criminal standard is justified by the international responsibility of government to prevent its territory from being used as a base for launching terrorist attacks against other countries. We demand that other countries live up to this responsibility and it is important that in

> our legislation we demonstrate a will to do so ourselves.

Senate Report 95–701, at 30, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3973, 3999.

We find highly persuasive the conclusions of Congress and the executive branch, the two branches most often concerned with foreign intelligence and national security questions, that international terrorist organizations are legitimate and important targets for foreign intelligence surveillance.

### 3. *Political Questions*

■ Defendants also argue that asking a court to determine what information is "necessary to ... the conduct of the foreign affairs of the United States," *see* 50 U.S.C. § 1801(e)(2)(B) (one definition of foreign intelligence information), and to apply the definition of international terrorism set forth in § 1801(c), is constitutionally impermissible because it ignores the separation of powers and embroils the court in a political question. Neither argument has merit.

Insofar as it is pertinent to the present case, the definition of international terrorism in § 1801(c) includes activities that (1) involve violent acts that would constitute a crime if committed in the United States, (2) appear to be intended to intimidate or coerce a civilian population or to influence the policy of a government by intimidation or coercion, and (3) occur totally outside the United States in terms of the persons apparently intended to be intimidated. These are not ephemeral concepts; nor do they have a content that is peculiarly political. We agree with Judge Sifton that, in applying this definition, the FISA Judge is merely called upon to make "findings of objective fact not unlike those made in courtrooms every day," *Megahey*, 553 F.Supp. at 1196, and not to make political judgments.

With respect to the definition of foreign intelligence information in § 1801(e)(2)(B), we do not see that this definition has any necessary application to this case. The activities of the defendants as relayed to the FBI agents by Hanratty plainly constituted

international terrorism, and information relating to international terrorism fits the definition of foreign intelligence information under § 1801(e)(1)(B). Resort to subsection (2)(B) would have been unnecessary. In any event, the FISA Court would not have been required to determine what is necessary to the conduct of the nation's foreign affairs. Rather, the federal official's application must include a certification by a member of the executive branch that the information sought is foreign intelligence information—which could of course include information necessary to the conduct of the nation's foreign affairs—and that the purpose of the surveillance is to obtain that type of information. 50 U.S.C. §§ 1804(a)(7)(A) and (B). But the FISA Judge's responsibility is not to make findings on this question. If the target of the requested surveillance is a United States person, the judge must merely find that the certification is not "clearly erroneous" on the basis of the statements made in the application, *id.* § 1805(a)(5); and if the target is not a United States person, the judge need only find that the application contains all statements and certifications required by § 1804, *id.* § 1805(a)(5). We agree with Judge Sifton that such limited review by the FISA Court does not unduly inject the courts into the making of foreign policy.

### 4. *Equal Protection*

▇ In several respects FISA treats United States persons, who are defined principally to include United States citizens and resident aliens, differently from non-United States persons. Section 1801(b), for example, makes a United States person an agent of a foreign power only if he "knowingly" engaged in certain activities; the section contains no knowledge requirement with respect to non-United States persons. Section 1801(e)(1) defines foreign intelligence information as information that "relates to" the United States' ability to protect against, *e.g.,* international terrorism if the information concerns a non-United States person, whereas that section defines such information as information "necessary to" the United States' ability to pro-

tect against international terrorism if it concerns a United States person. Under § 1805(a)(3)(A), in determining whether or not a target is an agent of a foreign power, the FISA Judge may make an affirmative finding based solely on activities protected by the First Amendment if the target is a non-United States person, but not if he is a United States person. Under § 1805(a)(5), the FISA Judge need only determine that the application contains all of the statements and certifications required by the Act if the target is a non-United States person, whereas he must also find that the certifications are not "clearly erroneous" if the target is a United States person. Finally, under § 1801(h), the minimization precautions are required only if the target is a United States person.

Defendants contend that these differences in the treatments of United States persons and non-United States persons impermissibly denied Megahey, a nonresident alien of the United States, the equal protection of the law. We disagree.

Although both the Fourth Amendment and the Equal Protection Clause afford protection to all aliens, *see Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (Fourth Amendment); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (equal protection), nothing in either provision prevents Congress from adopting standards and procedures that are more beneficial to United States citizens and resident aliens than to nonresident aliens, so long as the differences are reasonable, *see, e.g., Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). In *Diaz,* the Supreme Court unanimously upheld a federal statute denying aliens the right to enroll in the Medicare program unless they had been admitted for permanent residence and had resided in the United States for five years. The Court noted that

[t]he fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship

.... [A] host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other ....

... The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is "invidious."

*Id.* at 78–80, 96 S.Ct. at 1890–1892 (footnotes omitted). Thus, the Court recognized, as it had in the past, that it was appropriate that the political branches of government have the responsibility for regulating the relationship between the United States and aliens, since these matters implicate relations with foreign powers, and "a wide variety of classifications must be defined in the light of changing political and economic circumstances ...." *Id.* at 81, 96 S.Ct. at 1892. Accordingly, the Court has adopted a stance of minimal scrutiny respecting federal regulations that contain alienage-based classifications.

In enacting FISA, Congress plainly perceived a need to treat nonresident aliens and United States persons differently. In discussing a provision in an earlier draft of the Act, which provided for a less strict probable cause standard for non-United States persons, Senate Report 95–604 observed that

> where there are compelling considerations of national security, alienage distinctions are clearly lawful. The Director of the FBI testified in support of the different standard. He pointed out that large numbers of temporary aliens visit the United States and that many of these aliens are working for foreign intelligence networks. The Select Committee on Intelligence Activities similarly identified the problem, pointing out that one quarter of the Soviet exchange students coming to the United States in a ten-year period were found to be intelligence officers. This Committee is aware that less intrusive investigative techniques may not be able to obtain sufficient information about persons visiting here only for a limited time; the additional showing required for United States citizens and permanent resident aliens, therefore, may simply not be possible. Weighing these findings, recommendations, and considerations, as well as the recognized, bipartisan goal of enacting statutory safeguards in this area, the Committee has concluded that this distinction between United States citizens, lawful resident aliens and other aliens should be permitted.

Senate Report 95–604, at 21, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3904, 3922–23 (footnotes and emphasis omitted).

We agree with the district court that the different treatment accorded nonresident aliens under FISA is rationally related to the "Act's purposes of attempting to protect the United States against various types of acts of foreign powers and to acquire information necessary to the national defense or the conduct of foreign affairs." *Megahey,* 553 F.Supp. at 1200. In each instance, the distinctions are justified both by the greater likelihood that those engaged in the type of activities against which FISA seeks to protect the United States will be nonresident aliens, and by the need for the government to be able to act more quickly in situations where the target is unlikely to reside permanently in the United States.

### B. *Compliance with the Requirements of FISA*

Defendants contend that, even if FISA is constitutional, the evidence derived from the wiretap should have been suppressed because the provisions of FISA were not complied with, in that (1) the surveillance was conducted as part of a criminal investigation, rather than a national security investigation; (2) the district court erred in failing to disclose the information contained in the FISA applications and orders; and (3) Duggan, although allegedly a "target" of the FISA surveillance, was not so named in the FISA applications. We reject each of these contentions.

1. *The Alleged Use of FISA Surveillance to Conduct a Criminal Investigation*

Defendants contend that the surveillance of Megahey's telephone was not authorized by FISA because the information was sought as part of a criminal investigation. We see no grounds for concluding that the requirements of FISA were not met.

FISA permits federal officials to obtain orders authorizing electronics surveillance "for the purpose of obtaining foreign intelligence information." 50 U.S.C. § 1802(b). The requirement that foreign intelligence information be the primary objective of the surveillance is plain not only from the language of § 1802(b) but also from the requirements in § 1804 as to what the application must contain. The application must contain a certification by a designated official of the executive branch that the purpose of the surveillance is to acquire foreign intelligence information, and the certification must set forth the basis for the certifying official's belief that the information sought is the type of foreign intelligence information described. *Id.* § 1804(a)(7).

 Once this certification is made, however, it is, under FISA, subjected to only minimal scrutiny by the courts. Congress deemed it a sufficient check in this regard to require the FISA Judge (1) to find probable cause to believe that the target of the requested surveillance is an agent of a foreign power; (2) to find that the application is complete and in proper form; and (3) when the target is a United States person, to find that the certifications are not "clearly erroneous." The FISA Judge, in reviewing the application, is not to second-guess the executive branch official's certification that the objective of the surveillance is foreign intelligence information.[6] Further, Congress intended that, when a person affected by a FISA surveillance challenges the FISA Court's order, a reviewing court is to have no greater authority to second-guess the executive branch's certifications than has the FISA Judge:

> [I]n determining the legality of a surveillance ... the trial judge ... [is] not to make determinations which the issuing judge is not authorized to make. Where the bill specifies the scope or nature of judicial review in the consideration of an application, any review under these subsections is similarly constrained. For example, when reviewing the certifications required by [§ 1804(a)(7)], unless there is a prima facie showing of a fraudulent statement by a certifying officer, procedural regularity is the only determination to be made if a non-U.S. person is the target ....

House Report at 92–93.

 We see no basis for any suggestion in the present case that the application to the FISA Court did not meet the statutory requirement for certifying that the information sought was foreign intelligence information. At the time of the FISA application, the executive branch was aware that PIRA was an international terrorist organization and that Megahey played a leadership role in PIRA activities. In such circumstances, the foreign intelligence value of a FISA wiretap on Megahey's telephone would be plain: he would likely be a

---

**6.** FISA cannot, of course, give the government carte blanche to obtain a surveillance order in violation of a target's right to due process, and an application in which the requisite representations were fraudulently made would constitute such a violation. However, we would think that such a due process argument as to FISA orders should be governed by the principles set forth in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), with respect to Fourth Amendment requirements. Thus, the representations and certifications submitted in support of an application for FISA surveillance should be presumed valid. *See id.* at 171, 98 S.Ct. at 2684. To be entitled to a hearing as to the validity of those presentations, the person challenging the FISA surveillance would be required to make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included" in the application and that the allegedly false statement was "necessary" to the FISA Judge's approval of the application. *Id.* at 155–56, 98 S.Ct. at 2676–77. Defendants have made no such showing here.

prime source of information relating to PIRA membership, goals, methods, and operations. The publicly filed government affidavits in this case make clear that the FISA surveillance was instituted as part of an investigation of international terrorism. Moreover, we have reviewed the *in camera* submissions to the FISA Judge, and we agree with the district court's finding that "the purpose of the surveillance in this case, both initially and throughout, was to secure foreign intelligence information and was not, as [the] defendants assert, directed towards criminal investigation or the institution of a criminal prosecution." *Megahey*, 553 F.Supp. at 1190.

Finally, we emphasize that otherwise valid FISA surveillance is not tainted simply because the government can anticipate that the fruits of such surveillance may later be used, as allowed by § 1806(b), as evidence in a criminal trial. Congress recognized that in many cases the concerns of the government with respect to foreign intelligence will overlap those with respect to law enforcement. Thus, one Senate Report noted that

> [i]ntelligence and criminal law enforcement tend to merge in [the area of foreign counterintelligence investigations]
> . . . .
>
> . . . .
>
> [S]urveillances conducted under [FISA] need not stop once conclusive evidence of a crime is obtained, but instead may be extended longer where protective measures other than arrest and prosecution are more appropriate.

Senate Report 95–701, at 11, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3973, 3979–80 (footnote omitted).

In sum, FISA authorizes surveillance for the purpose of obtaining foreign intelligence information; the information possessed about Megahey involved international terrorism; and the fact that domestic law enforcement concerns may also have been implicated did not eliminate the government's ability to obtain a valid FISA order.

### 2. The District Court's Refusal to Disclose the Substance of the FISA Applications

 Defendant's contention that the district court erred in refusing to disclose the substance of the affidavits and certifications that accompanied the FISA applications need not detain us long. Section 1806(f) of FISA provides for *in camera, ex parte* review of the documents where the Attorney General has filed an affidavit stating that disclosure of the FISA applications and orders would harm the national security of the United States. The judge has the discretion to disclose portions of the documents, under appropriate protective procedures, only if he decides that such disclosure is "necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f). Such a need might arise if the judge's initial review revealed potential irregularities such as "possible misrepresentation of fact, vague identification of the persons to be surveilled or surveillance records which include[ ] a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order." Senate Report 95–604, at 58, *reprinted in* 1978 U.S.Code Cong. & Ad.News 3904, 3960. In general, however, "*ex parte, in camera* determination is to be the rule." *United States v. Belfield, supra,* 692 F.2d at 147.

We see no error in Judge Sifton's determination that disclosure was not necessary for an accurate determination of the legality of the surveillance of Megahey. Defendants have made no showing of misrepresented facts; they do not argue that Megahey was not clearly identified as a target. They have made no other presentation warranting disclosure. Under the circumstances, Judge Sifton did not abuse his discretion.

### 3. The Failure to Name Duggan as a Target of the Surveillance

Defendants contend that the fruits of the FISA surveillance should be suppressed because Duggan was not named as a target

of the surveillance. The import of this argument is, apparently, that because Duggan is a United States person, the preconditions to granting an FISA order allowing surveillance of Duggan would have been more stringent than they were for surveillance of Megahey, a nonresident alien. *See* Part II. A. 4., *supra.* Defendants' motion to suppress the evidence on this ground was properly denied by the district court on the grounds that it was untimely and lacked merit.

■ Section 1806(e) of FISA provides that motions to suppress evidence on the ground that the information was unlawfully acquired under FISA "shall be made before the trial ... unless ... the person was not aware of the grounds of the motion." Defendants did not make their motion with regard to the omission of Duggan until after trial. In this Court defendants argue that they did raise this argument prior to trial. However, they point only to their arguments as to FISA's use of a dual standard for United States persons and non-United States persons; they point to no argument that the government should have targeted Duggan and obtained an order to intercept his communications.

In the district court, defendants sought to excuse their tardiness in raising the Duggan-omission argument by stating that it was not apparent until near the end of trial that the FISA applications did not name Duggan as a target. The excuse was properly rejected. The government's pretrial memorandum on FISA identified Megahey as the "only defendant at whom the electronic surveillance was directed," and referred to the remaining defendants as having been only "overheard incidentally."

Memorandum of Law, dated September 24, 1982, at 2. In addition, Judge Sifton, in ruling on defendants' first FISA motion, identified Megahey as the "sole target" of the investigation and stated that no United States person had been targeted. *Megahey*, 553 F.Supp. at 1194–95. Defendants were thus twice put on notice prior to trial that Duggan had not been named as a target and they could have advanced the Duggan-omission argument in timely fashion. Their failure to do so constituted a waiver.

■ If defendants' argument as to the omission of Duggan had not been waived, we would reject it on its merits. The identification requirement imposed by FISA is only that an application for surveillance identify the "target of the electronic surveillance." 50 U.S.C. § 1804(a)(3). It is distinctly narrower than N.Y.Code Crim.Proc. § 813–a, at issue in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), which required identification of "the person or persons" whose communications were to be intercepted, *see id.* at 59, 87 S.Ct. at 1883; and narrower than 18 U.S.C. § 2518, which speaks in terms of the "person ... committing the offense and whose communications are to be intercepted," *see United States v. Donovan*, 429 U.S. 413, 416, 97 S.Ct. 658, 662, 50 L.Ed.2d 652 (1977). Once the proper preconditions are established with respect to a particular target, there is no requirement in FISA that all those likely to be overheard engaging in foreign intelligence conversations be named.[7] The consequent differences between the prerequisites for surveillance for crime control purposes and those for surveillance for national security purposes un-

---

7. Nor is there a Fourth Amendment requirement that all such persons be identified. In *United States v. Donovan, supra*, the Supreme Court stated as follows:

The Fourth Amendment requires specification of the "place to be searched, and the persons or things to be seized." In the wiretap context, those requirements are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized. It is not a constitutional requirement that all

those likely to be overheard engaging in incriminating conversations be named. Specification of this sort "identif[ies] the person whose constitutionally protected area is to be invaded rather than 'particularly describing' the communications, conversations, or discussions to be seized."

429 U.S. at 427 n. 15, 97 S.Ct. at 668 n. 15 (quoting *Berger v. New York, supra*, 388 U.S. at 59, 87 S.Ct. at 1883).

der FISA are reflections of Congress's view of the differing governmental interests to be served.

## III. THE MEEHANS' PROPOSED DEFENSE OF INSANITY

The Meehans challenge the district court's rejection of their proposed defense of insanity, claiming that the judge's adherence to the scheduled trial date and his "subjective rejection of a defense that was not his business but was exclusively a matter for the jury" violated both the letter and the spirit of Fed.R.Crim.P. 12.2(a), and constituted an improper exercise of discretion. We disagree and conclude that Judge Sifton was within his discretion in declining to find cause for defendants' noncompliance with the rule.

■ Rule 12.2(a) provides as follows: If a defendant intends to rely upon the defense of insanity at the time of the alleged crime, he shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk. If there is a failure to comply with the requirements of this subdivision, insanity may not be raised as a defense. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.

By its terms, therefore, Rule 12.2(a) contemplates that a defendant who fails to comply with the time requirements waives his right to raise an insanity defense. *United States v. Veatch*, 647 F.2d 995, 1002–03 (9th Cir.), *modified on other grounds*, 674 F.2d 1217 (1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); *United States v. Caplan*, 633 F.2d 534, 539 (9th Cir.1980); *United States v. Winn*, 577 F.2d 86, 89 (9th Cir.1978).

■ A defendant who has allowed his deadline to pass may, in accordance with Rule 12.2(a), move for permission to make a late filing and the district court may grant such permission "for cause shown." Whether the defendant has demonstrated sufficient "cause" is necessarily a matter for the district court to evaluate in its discretion on a case by case basis. *See United States v. Toner*, 728 F.2d 115, 123 (2d Cir.1984); *United States v. Veatch, supra; United States v. Dill*, 693 F.2d 1012, 1015 (10th Cir.1982). *See also United States v. Olson*, 576 F.2d 1267, 1273 (8th Cir.), *cert. denied*, 439 U.S. 896, 99 S.Ct. 256, 58 L.Ed.2d 242 (1978); *United States v. Edwards*, 90 F.R.D. 391 (E.D.Va.1981). "Cause" consists not only of explanation for the belatedness of the party's action, but also of a showing of some merit in the position belatedly to be advanced. *See United States v. Toner, supra*, 728 F.2d at 123 (upholding district court's ruling that cause had not been shown where defendant sought to "explore the 'possibility' that he might suffer from PTSD and that the disorder 'may' have caused him to commit the crimes charged").

■ In light of the proceedings below, we conclude that Judge Sifton did not abuse his discretion in ruling that the Meehans did not meet their burden of establishing cause sufficient to permit their late filing of their insanity defense. The Meehans first made their motion to present an insanity defense on December 30, 1982. Trial had originally been scheduled to start on September 28, 1982, and was then scheduled to begin on February 14, 1983. Upon receiving the Meehans' motion, Judge Sifton immediately ordered the attorneys to show cause why the late filing of the Meehans' insanity defense should be allowed, and he scheduled a hearing for January 10, 1983. At the January 10 hearing, the Meehans' attorneys submitted no papers or affidavits from experts detailing the basis for the proposed defense. The court instructed them to submit to the court in writing by January 21 information as to the doctors' initial findings of the nature of the Meehans' alleged mental disorder and the basis for believing that it was a valid defense in this case.

On January 21, the Meehans submitted to the court affidavits from counsel to the effect that their clients acted as if they had "something which seemed like a psychiatric disorder," and conclusory statements from two doctors that a "diagnostic possibility exists" that both Colm and Eamon Meehans suffered, as a consequence of their internment in a Northern Ireland prison in the early 1970's, from Post-traumatic Stress Disorder. The doctors projected that their efforts to diagnose the Meehans' alleged mental disorder would take 4–5 months, thus necessitating postponement of the trial until late April or early May. The doctors assured the court, however, that if given enough time to complete the project, they could provide counsel and the court with a "credible outcome."

By Order dated January 27, 1983, Judge Sifton denied the Meehans' application for leave to interpose the insanity defense. Characterizing the defendants' submission as more in the nature of "an application for a lengthy adjournment of the trial" than "an application for leave to file notice of a defense of insanity," Judge Sifton concluded that the defendants had failed to address the very issue he had asked them to illuminate, *i.e.*, how the alleged disorder

> might legally exculpate defendants from the crimes with which they are accused .... Since defendants have at present no factual basis on which to premise a defense of insanity and since the proposed adjournment promises nothing more than a possibility that such a defense will emerge, defendants' application for leave to interpose a defense or for an adjournment must be, in all respects, denied.

*Id.* at 2. Three days later, the Meehans' attorneys filed a motion for reconsideration, supported by an affidavit by one of the doctors, Dr. Zigelbaum, asserting that the Meehans did indeed suffer from PTSD and "as a result of this mental disease, these men were not able to conform their conduct to the requirements of the law." Dr. Zigelbaum's affidavit contained no evidence or clinical findings in support of his conclusions. The doctor stated that be-

cause of the "emotional fragility" of the defendants, they should not be examined by government psychiatrists at that time. The implication was that an adjournment would be required.

The court denied reconsideration in a Memorandum and Order dated February 9, 1983, observing that the defendants had again failed to show, despite the court's "clear invitation" to do so, "how defendants' psychiatric disease or defect, if such it be, incapacitated them in a fashion that exonerates them from liability under the legal standards applicable in this Circuit." *Id.* at 2. The court concluded that "[t]he inference is unavoidable" that the timing of the defendants' assertion of an insanity defense had been influenced by considerations of tactical advantage, which "not only fail to qualify as 'cause' for their belated notice of an intention to defend on grounds of insanity, but raise serious questions as to the merits of the defense proposed to be presented." *Id.* at 1–2.

The Meehans unsuccessfully renewed their motion twice more prior to trial. In denying a continuance in connection with the last such motion, the court emphasized (1) the unusual nature of the proposed insanity defense, which involved the questions not only whether PTSD is a mental disease or defect, but also whether it is "the kind of incapacitating psychiatric disorder that the law recognizes as an excuse for criminal misconduct"; (2) the public's interest in the speedy disposition of the charges, which had been pending since the previous summer; and (3) the dilatory character of the pursuit of the defense.

Finally, after their convictions, the Meehans filed posttrial motions pursuant to Fed.R.Crim.P. 33, seeking, *inter alia,* a new trial at which they would be allowed to present their insanity defense or, alternatively, a hearing at which to litigate the issues of counsels' diligence in pursuing the proposed PTSD defense and whether PTSD "is a mental disease or defect upon which an insanity defense may be predicated." No additional evaluative information

was presented; counsel simply announced that the psychiatric reports and affidavits submitted prior to trial were "uncontradicted."

By Memorandum and Order dated July 29, 1983, Judge Sifton denied the Rule 33 motions, concluding that "the evidence offered with regard to defendants' proffered defense of insanity and lack of intent would not warrant consideration by a jury, even if timely presented." *Id.* at 2. He noted that nothing in the defendants' motion papers or the psychiatric reports explained how the defendants' capacity to conform their behavior to the law "could have been impaired on the long-term basis necessary to establish an excuse for defendants' conduct as described by the defendants themselves from the witness stand," *id.* at 3–4 (footnote omitted), and termed the Meehans' proffer

> not only late, but without explanation as to why it was not discovered or presented by either counsel or defendants' psychiatric experts earlier in the course of their examination of the role which defendants' mental disease played in bringing about the commission of the offenses.

*id.* at 5 (footnote omitted).

We are unable to conclude from this sequence of events that the district court abused its discretion in refusing to allow the late filing of the defense. We agree with the court that the defendants did not present any valid explanation for their failure to make timely discovery of the facts supporting such a defense. Further, the timing and nature of the defendants' presentations supported the district court's view that the defendants sought to inter-

pose the defense for purposes of delay. The proposition that the Meehans suffered from PTSD was stated at first as merely a possibility to be explored. The court's requests for more information were repeatedly met by defense motions for adjournment of the trial, based first on the alleged inability of the doctors to make a diagnosis of the Meehans' purported disorder in less than 4-5 months and then, when the doctor suddenly discovered that he could make such a diagnosis in only two weeks, by the Meehans' apparent unwillingness to submit to a prompt examination by a government psychiatrist.

■■■ Despite what he suspected was tactical maneuvering, and despite the unanswered questions with regard to the validity of the proposed defense, Judge Sifton gave careful consideration to each of the many alternative dispositions proposed by counsel. His deliberation on the issues raised by the Meehans' belated injection of the insanity defense was thorough and conscientious. We are persuaded that his conclusion that cause had not been shown as required by Rule 12.2(a) was not an abuse of discretion.[8]

## IV. APPELLANTS' OTHER CONTENTIONS

■■■ Defendants make a variety of other arguments, chiefly that (1) the district court should have instructed the jury that it should find the defendants not guilty if it found they had relied on the apparent authority of Hanratty as an agent of the CIA; (2) the conduct of the government in conducting the investigation was so outrageous that it deprived them of due process of law; and (3) the court erred in

---

8. We also reject the Meehans' argument that the preclusion of this defense violated their Fifth and Sixth Amendment rights to be heard and to call witnesses. Those rights are not unlimited; they ensure that a defendant will not be denied the opportunity to present testimony that is relevant, material, and vital to the defense. *See United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193

(1982); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). In light of defendants' repeated failures to present more than conclusory statements that they were afflicted with PTSD, and to show in what way that could relieve them of responsibility for the crimes charged, we cannot conclude that the Meehans presented an adequate basis for find-

making various evidentiary rulings.[9] We find merit in none of them.

## A. *The Mistake of Law Defense*

Defendants contend that the district court erred in refusing to give their proposed jury instruction allowing them a defense for reasonable good faith reliance on apparent authority, based on their alleged mistaken belief that Hanratty had apparent authority to sanction their gun-running activities. We conclude that the court properly refused to give the instruction since defendants had failed to demonstrate a basis warranting submission of this requested charge to the jury.

 It is well settled that ignorance of the law or mistake as to the law's requirements is not a defense to criminal conduct. *See, e.g., United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 563, 91 S.Ct. 1697, 1700, 29 L.Ed.2d 178 (1971); *Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 242, 2 L.Ed.2d 228 (1957); *United States v. Gregg,* 612 F.2d 43, 51 (2d Cir.1979). The mistake that defendants advance here as an excuse for their criminal activities—their reliance on Hanratty's purported authority—is an error based upon a mistaken view of legal requirements and therefore constitutes a mistake of law. *See United States v. Barker,* 546 F.2d 940, 946 (D.C.Cir.1976).

 There are few exceptions to the mistake of law rule. There is an exception for legitimate reliance on an official interpretation of law. *See, e.g., Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *United States v. Mancuso,* 139 F.2d 90 (3d Cir.1943). There is also an exception for responding to a police officer's call for assistance in making unlawful arrests or searches. *See People v. Weiss,* 276 N.Y. 384, 12 N.E.2d 514 (1938). The traditional exceptions have no application to the present case, however, and defendants urge us to adopt the reasoning of *United States v. Barker, supra,* which they say extended the exception for reliance on official authority to apply where the defendants have relied in good faith on an individual who does not have actual authority to permit the proscribed activity. We do not read the *Barker* opinions so broadly, and we do not believe the present case fits within the formulations there set forth.

*Barker* involved defendants who had been recruited to participate in an allegedly top-secret national security operation aimed at foreign agents leaking intelligence information and led by E. Howard Hunt, whom defendants knew first hand to be a longtime CIA agent then employed in the White House. Defendants' convictions were reversed, and the case was remanded for a new trial, by a 2–1 vote, with Judges Merhige and Wilkey in the majority. Those two judges agreed that the defendants might have a valid defense based on an exception to the mistake of law rule, but they disagreed on the parameters of the exception.

Judge Merhige recognized only the traditional exception to the mistake of law doctrine for reasonable reliance on a conclusion or statement of law issued by an official charged with interpretation, administration, or enforcement in the relevant legal field. 546 F.2d at 955 (opinion of Merhige, J.). Judge Wilkey's opinion proposed instead to recognize a defense based on

ing that the proposed defense was material or vital.

**9.** Among their other arguments, defendants assert that the district court should have suppressed the evidence, obtained through the search by customs officials at Port Newark, New Jersey, of the shipping container loaded with weapons and electronics equipment by Eamon and Colm Meehan. We conclude that the district court properly refused to suppress the contents of the shipping container. The motion to suppress this evidence was not made until mid-trial and thus the district court correctly found that this claim had been waived under Fed.R.Crim.P. 12(b)(3). Moreover, since the containers were scheduled to be shipped from port imminently, the search was authorized under the border-search exception to the Fourth Amendment. *See, e.g., United States v. Ajlouny,* 629 F.2d 830, 834–36 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981).

reliance on apparent authority, requiring a showing of *"both* (1) *facts* justifying [the defendants'] reasonable reliance on Hunt's apparent authority and (2) *a legal theory* on which to base a reasonable belief that Hunt possessed such authority." 546 F.2d at 949 (opinion of Wilkey, J.) (emphasis in original). Since Judge Leventhal dissented altogether, the exception espoused by Judge Wilkey received but one vote and cannot be viewed as the rationale of the court.

We decline to adopt Judge Wilkey's view that a defendant may be exonerated on the basis of his reliance on an authority that is only apparent and not real. Even were we to agree with that view, however, we could not conclude that the defendants in the present case met the test Judge Wilkey set forth since they presented neither facts nor a legal theory that would make their alleged reliance justifiable. The only evidence presented by defendants to justify their reliance on Hanratty's apparent authority is their testimony that Hanratty represented himself to be a CIA agent and showed Duggan and Megahey a white laminated card with "Central Intelligence Agency" printed on it, and their testimony that Sloan had "checked Hanratty out." No objective evidence was presented regarding Hanratty's purported CIA claim and there was no corroboration of defendants' claims about Hanratty's alleged assertions. The defendants knew Hanratty for only three weeks before they began dealing with him, they lacked personal knowledge of his claimed status, and they sought no independent verification that he was a CIA agent.

Nor was any reasonable legal basis shown for defendants' professed belief that Hanratty had authority to sanction such plainly unlawful activity as international trafficking in firearms and explosives. Indeed, Megahey acknowledged, on cross-examination, that he was aware that CIA operatives had been sought on criminal charges, despite their CIA background, for engaging in the same conduct the defendants attributed to Hanratty.

In sum, we agree with the district court that the defendants failed to establish that they were entitled to a jury instruction on any defense based on an exception to the general principle that a mistake of law is no defense.

### B. *The "Outrageous Government Behavior" Defense*

■ Defendants argue that the behavior of the government in the investigation of this case was so outrageous and shocking as to deprive them of due process of law. They contend chiefly that Hanratty, the FBI informant, played on their emotional and psychological sensitivities to the situation in Northern Ireland in a successful effort to coerce them into committing unlawful acts. We find these contentions without merit.

The Supreme Court has noted the possibility that a due process violation grounded in outrageous government conduct might be available even if the defendant, because of his predisposition, could not establish an entrapment defense. *See United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973). As Justice Powell subsequently commented, however, "[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring).

We have rarely sustained due process claims concerning government investigative conduct, stressing that the conduct involved must be "most egregious," *United States v. Alexandro,* 675 F.2d 34, 40 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982), and " 'so repugnant and excessive' as to shock the conscience," *United States v. Romano,* 706 F.2d 370, 372 (2d Cir.1983) (quoting *United States v. Alexandro, supra,* 675 F.2d at 39). Thus, we have upheld against due process challenges drug convictions resulting from transactions initiated by government informants using government-supplied drugs, *see United States v. Romano, supra,* 706 F.2d at 372, and convictions in

the Abscam cases, where government operatives proposed various unlawful schemes, *see United States v. Williams*, 705 F.2d 603 (2d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983); *United States v. Alexandro, supra*, 675 F.2d 34.

The district court, after hearing all of the testimony in this case, rejected defendants' due process claim, finding that defendants' testimony as to the informant's misconduct was simply not credible and noting that defendants had presented no evidence warranting a further hearing. We see no basis on which to question the rejection of this defense. The government conduct in this case was a good deal less intrusive than some conduct we have condoned. Thus, unlike the government actions in *United States v. Romano* and *United States v. Alexandro, supra*, where government operatives approached the defendants with the illegal schemes, in this case Duggan has admitted that it was he who sought out Hanratty. Duggan was not introduced to undercover FBI agents until after he and Megahey repeatedly asked Hanratty about his gun-running acquaintence, "Luis"; and all other initiatives came from the defendants as well. The overwhelming evidence presented through tape, videotape, and the testimony of the government witnesses supports the district court's refusal to grant defendants' motion to dismiss on this due process argument.

### C. *Miscellaneous Arguments*

█ Finally, defendants complain of a number of the trial court's evidentiary rulings. Principally they argue that the court should have permitted them to introduce (1) prior statements of a witness who asserted his Fifth Amendment privilege against self-incrimination at trial, (2) so-called "expert" testimony as to prior CIA involvement in shipments of arms to Northern Ireland, and (3) representations by a former FBI informant as to CIA approval of such arms shipments. Our review of the record reveals that the court gave defendants the benefit of the doubt with respect to the relevance of these proffered items of evidence and excluded them pursuant to Fed.

R.Evid. 403 because it believed the prejudice and possibility of confusing the jury substantially outweighed the evidence's probative value. We see no abuse of the court's discretion in reaching this conclusion.

█ We likewise find no abuse of discretion in the court's decision to admit evidence of the unrelated arrests of five PIRA members, one of whom was carrying the name and telephone number of Duggan and who was described by Duggan to Hanratty as an electronics expert and money courier for the Duggan-Megahey dealings with Hanratty. The evidence was relevant to show the scope of the conspiracy, and the court's conclusion that its probative value outweighed its prejudicial effect was not improper.

We have considered all of defendants' remaining contentions and find them to be without merit.

### CONCLUSION

The judgments of conviction are affirmed. The mandate shall issue forthwith.