UNITED STATES of America,

v.

**Omar Ahmad Ali Abdel RAHMAN, a/k/a "Omar Amed Ali," a/k/a "Omar Abdel Al–Rahman," a/k/a "Sheik Rahman," a/k/a "The Sheik," a/k/a "Sheik Omar," El Sayyid Nosair, a/k/a "Abu Abdallah," a/k/a "El Sayyid Abdul Azziz," a/k/a "Victor Noel Jafry," Ibrahim A. El–Gabrowny, Siddig Ibrahim Siddig Ali, Clement Rodney Hampton–El, a/k/a "Abdul Rashid Abdullah," a/k/a "Doctor Rashid," Mohammed Abouhalima, Abdo Mohammed Haggag, Amir Abdelgani, a/k/a "Abdou Zaid," Fares Khallafalla, a/k/a "Abdou Fares," Tarig Elhassan, Fadil Abdelgani, Mohammed Saleh, a/k/a "Mohammed Ali," Victor Alvarez, a/k/a "Mohammed," Matarawy Mohammed Said Saleh, a/k/a "Wahid," Earl Gant, a/k/a "Abd Rashid," a/k/a "Abd Jalil," a/k/a "Abdur Rasheed," Defendants.**

**No. S3 93 Cr. 181 (MBM).**

United States District Court, S.D. New York.

Aug. 18, 1994.

Patrick J. Fitzgerald, Robert S. Khuzami, Andrew C. McCarthy, Alexandra Rebay, Asst. U.S. Attys., New York City, for U.S.

Emmanuel A. Moore (Legal Advisor to defendant Abdel Rahman, pro se).

William M. Kunstler, Ronald L. Kuby, New York City, for defendant Siddig Ali.

Kenneth D. Wasserman, New York City, for defendant Hampton–El.

Wesley M. Serra, Brown Berne & Serra, New York City, for defendant Alvarez.

Charles Lavine, Grossman Lavine & Rinaldo, Forest Hills, NY, for defendant Fadil Abdelgani.

### OPINION AND ORDER

MUKASEY, District Judge.

The defendants in this case are charged with participating in a seditious conspiracy to conduct a war of urban terrorism against the United States, and with related acts and agreements in furtherance of that goal. Now before the court are motions by Omar Ahmad Ali Abdel Rahman, Siddig Ibrahim Siddig Ali, Clement Rodney Hampton–El, Victor Alvarez and Fadil Abdelgani to suppress tape recorded telephone calls which the government intends to introduce at trial, and which were obtained by the government through electronic surveillance that the government says was conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA" or the "Act"). 50 U.S.C. §§ 1801–1811 (1988). Also before the court is an application by the government to have the legality of its surveillance determined based on *ex parte, in camera* submissions, pursuant to 50 U.S.C. § 1806(f). For the reasons set forth below, the government's application is granted and the defendants' motions are denied.

### I.

The Act creates a Foreign Intelligence Surveillance Court ("FISA court") which reviews government applications to conduct surveillance in aid of protecting the United States against attack by foreign governments or international terrorist groups. 50 U.S.C. §§ 1801(e), 1803. The surveillance in question here was conducted based on six separate applications relating to four separate defendants: Rahman, Hampton–El, Siddig Ali and Earl Gant. Rahman and Hampton–El were the subject of two applications each. These applications and related documents are contained in a sealed exhibit submitted to the court. On June 30, 1993 and September 2, 1993, the Attorney General, acting pursuant to 50 U.S.C. § 1806(b), authorized use of materials derived from the electronic surveillance in connection with this prosecution.

Each of the six orders was signed by a judge of the FISA court, and is based on an application accompanied by a certification from either the Director of the FBI or the Assistant to the President for National Security Affairs, each of whom is or had been authorized to make such certification pursuant to authority granted by 50 U.S.C. § 1804(a)(7), that the information sought is foreign intelligence information within the meaning of 50 U.S.C. § 1801(e)(1)(B)—*i.e.,* information relating to either a United States citizen or a lawful resident alien that is necessary to protect the United States against "sabotage or international terrorism by a foreign power or an agent of a foreign power." The statute defines a "foreign power" to include "a group engaged in international terrorism or activities in preparation therefor," 50 U.S.C. § 1801(a)(4), and defines "international terrorism" as activities that:

(1) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State,

(2) appear to be intended—

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by assassination or kidnapping; and

(3) occur totally outside the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum.

50 U.S.C. § 1804(c). Each of the orders is accompanied by one or more implementing or amended orders and certifications therefor.

The FISA court judge who reviewed each of the applications was charged under the statute with determining only that there was probable cause to believe that the target of the surveillance was an agent of a foreign power as defined in the statute, including a member of a group engaged in international terrorism or activities in preparation for such terrorism, 50 U.S.C. § 1801(b)(2)(C), (D), that the application contained all the necessary certifications and that the certifications were not clearly erroneous, including insofar as they represented that the primary purpose of the surveillance was the gathering of foreign intelligence information. 50 U.S.C. § 1805; *United States v. Duggan,* 743 F.2d 59, 77 (2d Cir.1984). Specifically, it was not the function of that FISA court judge nor is it the function of this judge to "second-guess" the certifications. *Duggan,* 743 F.2d at 77.

Also included with the materials submitted to the court is the affidavit of the Acting Assistant Director of the FBI, sworn to September 2, 1993, describing some of the foreign intelligence information derived from the surveillance and why disclosure of the applications and other materials that comprise the sealed exhibit would be prejudicial to the security interests of the United States. These reasons include disclosure to possible terrorist groups of the nature of the information gathered by this country, the methods used to gather such information, and other sensitive information about the techniques and capabilities employed by this country to detect and combat international terrorism.

Based on that affidavit, the Attorney General has averred by affidavit sworn to September 7, 1993,

that to publicly disclose, or have an adversary hearing with respect to, the particular facts contained in the sealed Exhibit and concerning electronic surveillance other than to the court, *ex parte, in camera,* would harm the national security of the United States; that the sealed Exhibit contains sensitive information concerning United States intelligence sources and methods and other information relating to United States efforts to conduct counterterrorism investigations; and that it would damage the security interests of the United States to further reveal the sources and methods this Nation is using to conduct such investigations.

(Reno Aff. 9/2/93 ¶ 4)

The statute directs that this court's function when presented with motions of the kind involved here is to review the application and related materials "in camera and ex parte ... to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted." 50 U.S.C. § 1806(f). The statute authorizes disclosure of such materials or portions thereof to an aggrieved party, under appropriate security procedures and protective orders, "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." *Id.* Finally, the statute directs that the fruits of surveillance not lawfully authorized or conducted be suppressed, but that if the court determines that the surveillance has been lawfully authorized and conducted, "it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure." § 1806(g).

## II.

■ Based on the statutory provisions above cited and the materials above described, I find that no disclosure to any of the moving defendants is necessary to make an accurate determination of whether the surveillance at issue was lawfully authorized or conducted. Although no more is necessary under the statute to determine the le-

gality of the surveillance, Siddig Ali argues, apparently as a matter of due process, *see* 50 U.S.C. § 1806(f), *supra*, not so much that discovery or disclosure is required as that in view of the disclosure of the substance of the surveillance itself in this case there is no longer any justification for the Attorney General's position that disclosure of the sealed exhibit would harm national security.

That argument has no factual merit because the information heretofore disclosed—the substance of the intercepted conversations—does not compromise the security concerns that underlie the Attorney General's request that the exhibit remain confidential. Thus, disclosure of the conversations does not disclose the strategies, capabilities and techniques of those who gather information, or risk disclosing the identity of those who may provide information.

Beyond its lack of factual merit, the argument has no logical application here because there has been no suggestion of how disclosure is necessary for the court to evaluate the lawfulness of the surveillance or is otherwise necessary to assure due process. Because those are the only justifications for disclosure, the motions will be decided with the submitted material held *in camera*.

### III.

■ The moving defendants' main argument is that FISA was misused. They argue that the principal purpose of a FISA surveillance must be to gather foreign intelligence information, 50 U.S.C. § 1804(7)(B); *Duggan*, 743 F.2d at 77, but that the purpose of the surveillance here was to gather evidence for a criminal case. However, once a reviewing court—be it the FISA court or this court—finds that an authorized executive branch official has certified that that is the purpose, and his certification is supported by probable cause to believe that the target is an agent of a foreign power as defined in the statute, and that the location is one being· or to be used by the target, and it appears from the application as a whole that that certification is not clearly erroneous, the task of that court is at an end. *Duggan*, 743 F.2d at 73–74. Again, a reviewing court is not to "second-guess" the certification. *Id.* at 77.

In this case, each of the applications contained ample basis for believing that the target of the surveillance was an agent of a foreign power as defined in the statute, which is to say in this case a participant or conspirator in a group engaged in or planning international terrorism, and that the location at which the surveillance was to be conducted was being used or would be used by that person. Further, none of the applications, each read as a whole, suggests that its underlying certification is erroneous, let alone clearly so.

■ The statute itself was written with full anticipation that those defined as agents of a foreign power would violate the laws of the United States, *see, e.g.*, 50 U.S.C. § 1801(c)(1) and (d) (defining subject activity to include violations of United States law), and that foreign intelligence information would be used in criminal prosecutions. *See, e.g.*, 50 U.S.C. § 1806(b) and (c) (providing for use in criminal proceedings following notice). Therefore, it is not compelling to argue, as the moving defendants do, that because the government believed that these defendants had violated or would violate a criminal statute, the primary purpose of the surveillance cannot have been gathering of foreign intelligence, FISA was misused, and the evidence therefore must be suppressed. There is no contradiction, indeed there probably is often a congruence, between foreign intelligence information and evidence of criminal wrongdoing. That does not mean the government may not avail itself of FISA in order to protect national security when to do so will also generate evidence that may be used in a criminal case. "[O]therwise valid FISA surveillance is not tainted simply because the government can anticipate that the fruits of such surveillance may later be used, as allowed by § 1806(b), as evidence in a criminal trial." *Duggan*, 743 F.2d at 78.

There is nothing in the material submitted to the court or in the surrounding circumstances to suggest any misuse of FISA as suggested by the moving defendants, and therefore the motion to suppress on that ground is denied.

## IV.

■ Hampton–El and Rahman challenge the certification by the authorized official that each was an "agent of a foreign power" and therefore a proper target of FISA surveillance. Hampton–El simply states that such a label must have been knowingly or recklessly wrong as applied to him, and Rahman argues that only an "international organization" can be an agent of a foreign power, and he is not such an organization. It is sufficient response to both claims to point out that the statute defines an agent of a foreign power to include a person who "knowingly engages in sabotage or international terrorism," or knowingly aids and abets another to do so, 50 U.S.C. § 1801(b)(2)(C), (D), and to find, as I do, that the application contained ample basis for concluding that there was probable cause to believe both men fit that category.

■ Hampton–El's casual suggestion that no statements of his that are arguably protected by the free speech or free exercise provisions of the First Amendment, U.S. Const. amend. I, cl. 1, 2, could constitute evidence that he was an agent of a foreign power (Hampton–El Mem. at 17), is simply wrong. *Brandenburg v. Ohio*, 395 U.S. 444, 448, 89 S.Ct. 1827, 1830, 23 L.Ed.2d 430 (1969); *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir.) and cases cited therein, *cert. denied*, 498 U.S. 828, 111 S.Ct. 87, 112 L.Ed.2d 59 (1990).

■ Although both Alvarez and Abdelgani challenge their status as agents of a foreign power, neither has standing to challenge the admissibility of evidence on that basis because, although both were overheard in the course of FISA surveillance, neither was a target of such surveillance, and therefore there need have been no finding that either fit the statutory definition before surveillance of others was authorized.

## V.

■ Siddig Ali and Hampton–El have challenged the sufficiency of the minimization conducted here because apparently all calls were recorded rather than simply monitored intermittently with only relevant portions recorded. Siddig Ali notes that his wife's conversations were recorded, and Hampton–El notes that he speaks English and therefore monitoring would have been possible as to his conversations. Siddig Ali also faults the government for failure to detect "patterns of innocent conversations" that would have permitted certain calls to pass unrecorded. (Siddig Ali Mem. 15)

The minimization procedures followed here were the standard minimization procedures incorporated in the surveillance orders at issue, which specifically permit either contemporaneous monitoring or automatic recording. (Sealed Exhibit, Tab 4 § 3(d)) They provide for the possibility that all communications in connection with a surveillance may be acquired, and direct that the monitoring of tapes of such communications be conducted with the same procedures as live monitoring. (*Id.* § 3(e)(2), (3)) It appears that those procedures were followed, with summaries at the logging stage referring only in broad terms to the content of apparently non-relevant calls, logs distributed only to targets, and only pertinent calls distributed generally. (Gov't.Mem. 5/18/94 at 21–22 n. 18, 19)

The government offers five reasons why it was necessary here to record all calls automatically. First, many conversations were in Arabic, a language with many dialects and one not easily monitored. Second, the government points to use of coded or cryptic language, which makes it difficult to decide while a call is being monitored which parts of it may be relevant and which are not. Third, the government notes that all the authorized interceptions were completed within the 90-day period of the initial authorizations, with the result that there was not a great deal of time to detect patterns of innocent conversations, if there were such patterns. In addition, the government cites two portions of FISA legislative history to support the argument that when the purpose of surveillance is to gather intelligence about international terrorism, greater flexibility in acquiring and storing information is necessary, because innocent-sounding conversations may later prove to be highly significant, and because individual items of information, not apparently significant when taken in isolation, may

become highly significant when considered together over time. H.R.Rep. No. 1283, 95th Cong.2d Sess., pt. 1 at 55, 59 (1978).

The moving defendants have not disputed the government's account of its minimization in this case, nor have they seriously contested the government's arguments, beyond insisting that the wheat could have been separated from the chaff while the stalks were still growing. That is simply not persuasive.

For the above reasons, the motions to suppress the FISA interceptions are denied.

SO ORDERED.